**SEKCO ENERGY, INC.**

v.

**M/V MARGARET CHOUEST, M/V EDISON CHOUEST, and M/V CAPE RACE, in rem; and Edison Chouest Offshore, Inc., Geco Geophysical, Inc., and Sea Mar Venture II, Inc., in personam.**

Civ. A. No. 92–0420.

United States District Court, E.D. Louisiana.

April 22, 1993.

James G. Burke, Jr., Andrew C. Wilson, Burke & Mayer, New Orleans, LA, for plaintiff.

Cecil Gordon Starling, Jr., John C. Duplantier, Gelpi, Sullivan, Carroll & Gibbons, PLC, Sherman Gene Fendler, Russell Keith Jarrett, Liskow & Lewis, David B. Lawton, Terriberry, Carroll & Yancey, New Orleans, LA, for defendants.

## RULING ON MOTIONS

LIVAUDAIS, District Judge.

Defendants have filed a Motion for Summary Judgment on all issues except liability under LSA–C.C. art. 2315. Plaintiff opposes the motion, and has filed a Cross Motion for Partial Summary Judgment which defendants oppose.

### I. Factual Background

In July and August of 1991, plaintiff Sekco Energy, Inc. ("Sekco") owned and operated a fixed offshore drilling platform located in Vermillion Block 315 in the Gulf of Mexico, off the coast of Louisiana. The Minerals Management Service ("MMS") granted Sekco a leasehold interest in Block 315, under which Sekco held the exclusive right to explore and drill for hydrocarbon. At the same time, defendant Edison Chouest Offshore, Inc. ("Chouest") owned and operated two offshore utility vessels, the M/V MARGARET CHOUEST and the M/V EDISON CHOUEST. Defendant Sea Mar Venture II, Inc. ("Sea Mar") owned and operated the offshore utility vessel M/V CAPE RACE. Defendant Geco Geophysical, Inc. ("Geco") was the time charterer of the above vessels.

During July and August of 1991, Geco conducted seismographic surveys in an area of the Gulf of Mexico including Vermillion Block 315. Geco chartered the M/V EDISON CHOUEST and the M/V MARGARET CHOUEST to tow its seismic line for use in the surveys. The seismic line contained a mineral oil known as Isopar M. As the M/V EDISON CHOUEST towed the seismic line on the morning of July 31, 1991, the line contacted the leg of Sekco's platform. Neither Chouest nor Geco informed Sekco that the seismic cable struck the platform's leg. Barnacles on the leg ripped open the cable and Isopar M flowed into the surrounding water. The Sekco platform did not sustain any compensable physical damage. At the time of the impact, a tail buoy detached from the seismic line and remained under the platform.

Later that morning, the M/V CAPE RACE retrieved the buoy with a grappling hook. Plaintiff claims that the M/V CAPE RACE struck its platform, but defendants deny that any such accident occurred. As the platform personnel observed the retrieval, they noticed an unidentified sheen surrounding the M/V CAPE RACE. Personnel on another platform noticed the sheen as well and reported it to the MMS. MMS officials then visited the Sekco platform in order to investigate the pollution.

Defendants claim that before MMS officials visited the platform, they ordered Sekco to "shut in" (stop operating) the platform in order to investigate the pollution. Sekco denies this charge and asserts that while MMS officials ordered the "shut in," they did not do so before they visited the platform. All parties agree that defendants did not report the spill to any regulatory agency at any time. On August 2, 1991, Sekco hired divers

to inspect the platform and its appurtenances.

## II. Analysis

### A. *Maritime Tort Claims*

#### 1. Negligence

Sekco claims that defendants' negligence caused the shut in of its platform, which resulted in the loss of revenues derived from production. Defendants argue that as a matter of law, plaintiff cannot maintain a maritime tort claim for economic losses unless it has sustained physical damage to a proprietary interest. No factual dispute exists with regard to this specific inquiry; the parties agree that plaintiff suffered economic loss, and that the loss did not result from physical damage to plaintiff's platform. The parties dispute only the legal determination of whether plaintiff may maintain a cause of action here.

Defendants argue that *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and its progeny preclude plaintiff's negligence claim. The *Robins* Court held that a time charterer of a vessel could not recover against the dry dock for any negligence that delayed the charterer's use of the vessel; only the vessel's owners who had a contract with the dry dock could maintain a cause of action. The dry dock company knew nothing of the charter party and therefore could not be held liable for unintended injuries suffered by the charterer. *Id.* at 308–09, 48 S.Ct. at 135.

The seminal case construing *Robins* is *State of La. ex rel. Guste v. M/V TEST-BANK*, 752 F.2d 1019 (5th Cir.1985) (en banc). The *TESTBANK* court reaffirmed the principle set forth in earlier Fifth Circuit decisions interpreting *Robins:* A plaintiff cannot recover for economic loss absent physical damage to a proprietary interest. 752 F.2d at 1024. That principle, however, does not function to bar every single economic loss claim that is unaccompanied by physical damage. As with any legal principle, the one at hand must be construed and applied in light of the policy which encouraged its creation in the first place.

■ Underlying the *Robins* decision "was a pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability." *TESTBANK*, 752 F.2d at 1023. The charterer failed to recover on its delay claims because the Court believed the relationship of the claims to the negligently injured vessel to be too remote. A finding that the dry dock could be held liable to the charterer, because the contract between the vessel owner and the charterer was foreseeable, would invite other parties even more remote to the injury to file suit. *See id.* The *Robins* Court therefore severed the chain of liability at those parties who suffer physical injury to a proprietary interest. If the line were drawn "on the other side" of the physical damage requirement, each successive claimant would argue that the court should allow his or her claim, and sever the chain of liability at the next plaintiff. "The result would be that no determinable measure of the limit of foreseeability would precede the decision on liability." 752 F.2d at 1028.

Granting summary judgment for defendants in the present action, however, would not further the goal of maintaining a definable measure of foreseeability. Unlike the plaintiffs in *Robins* and *TESTBANK*, Sekco's relationship to the alleged tort is not remote. The charterer in *Robins* and the many plaintiffs in *TESTBANK* were each one or more steps removed from the principal cause of action; they had no proprietary interest in the object which sustained damage. The requirement of physical damage to a proprietary interest prevented a long series of remote plaintiffs from engaging in seemingly endless litigation. In the present case, however, Sekco has an ownership interest in the offshore platform. Employing the *Robins* requirement to bar Sekco's negligence claim defies logic. To say that Sekco could maintain a cause of action for economic loss if the seismic cable had slightly dented the leg of the platform, but that it cannot do so if the leg sustained no damage, makes no sense. Defendants have attempted to bind this Court in a semantic straitjacket by asking it to blindly apply a rule of law without any regard for its historical purpose.

Rather than following this course, the Court notes that the "critical factor in the application of the *Robins* holding . . . [is] 'the character of the interest harmed'." *Vicksburg Towing v. Mississippi Marine Transport,* 609 F.2d 176, 177 (5th Cir.1980) (quoting *Dick Meyers Towing Service, Inc. v. United States,* 577 F.2d 1023, 1025 (5th Cir. 1978) (footnote omitted). The *Vicksburg* court employed this factor in distinguishing the facts before it from the *Robins* facts; "[u]nlike the plaintiffs in *Robins* . . . the plaintiff here is the owner of the damaged property. It has an insurable interest. It has all of the elements of ownership which attach to a freehold interest, **including the right of use,** a thing of value." 609 F.2d at 177. In the present case, Sekco owned the offshore oil platform, and its ownership interest includes the right to use that platform. The interference with that right underlies its claim for economic loss. Under *Vicksburg,* the key consideration here is the character of Sekco's interest and not whether the platform sustained any physical damage. Furthermore, the *TESTBANK* court specifically noted the *Vicksburg* case and left its reasoning intact. 752 F.2d at 1024.

The language in *Nicor Supply Ships Associates v. General Motors,* 876 F.2d 501 (5th Cir.1989), upon which defendants rely, is inapplicable here. The passage which defendants cite explains the method for calculating damages in a products liability case.

Today's ruling does not reach the issue of liability. Whether defendants were negligent certainly cannot be determined as a matter of law at this point; among other factual disputes, the parties appear to disagree about the origin or origins of the "sheen" which allegedly caused Sekco's economic loss. The Court here merely recognizes that plaintiff can proceed with its cause of action for the maritime tort of negligence. Consequently, defendants' motion for summary judgment on this issue is **DENIED,** and plaintiff's cross-motion is **GRANTED.**

## 2. Intentional Tort

Plaintiff has failed to identify the specific intentional tort which the defendants allegedly committed. Both the plaintiff's complaint and its opposition memorandum charge that defendants Geco and Chouest intentionally failed to report the spill of Isopar M from the seismic cable. Based on this charge and the relief sought, the Court believes that plaintiff has attempted to make a claim for intentional interference with the contractual relationship (leasehold agreement) between Sekco and MMS. Sekco alleges that Geco and Chouest's failure to report the spill caused it to incur expenses and to lose production revenues. In other words, Sekco's leasehold contract became less valuable during the "shut in" period.

Contrary to defendants' assertions, the *Robins* doctrine does not necessarily prevent plaintiff from stating a cause of action here.[1] First, the reasons set forth above for allowing a negligence claim apply here. Second, in construing *Robins,* the *TESTBANK* court declined to address intentional torts. 752 F.2d at 1020 n. 1.

"[A] plaintiff may not recover for interference with his contractual relations unless he shows that the interference was intentional or knowing." *Dick Meyers Towing Service, Inc.,* 577 F.2d at 1025. The question that this Court must now answer is whether an issue of fact exists with regard to defendants' awareness of the leasehold contract, and their alleged intention to interfere with that contract by failing to report the Isopar M spill.

Defendants have stated that no factual issue exists with regard to any intention to interfere with plaintiff's contract and cause a "shut in." The Court agrees. Plaintiff "may not rest upon the mere allegations or denials of [his] pleadings, but . . . must set forth

---

1. The Court recognizes that it might not have admiralty jurisdiction over the intentional tort claim; the alleged wrong must bear "a significant relationship to traditional maritime activity" in order for jurisdiction to attach. *Kuehne & Nagel (AG & CO) v. Geosource, Inc.,* 874 F.2d 283, 288 (5th Cir.1989). In light of Fifth Circuit precedent, one could argue that Sekco's production of hydrocarbons did not constitute traditional maritime activity. *See Thurmond v. Delta Well Surveyors,* 836 F.2d 952 (5th Cir.1988). This Court, however, need not decide the jurisdictional issue because plaintiff's claim cannot survive summary judgment on its merit.

specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Not only has Sekco failed to set forth specific facts showing that defendants intended to interfere with its contract, but Sekco has failed to set forth specific facts showing that defendants knew about the leasehold agreement in the first place. Consequently, defendants' motion for summary judgment on the issue of intentional tort is **GRANTED.** Insofar as plaintiff's cross motion seeks disposition of this issue, the motion is **DENIED.**

## B. *Nuisance*
### 1. Private Nuisance

Plaintiff bases its claim here on both federal common law and state law. The Court first addresses the state law charge.

### a. *State Law*

■ Plaintiff argues that the law of the adjacent state, Louisiana here, applies to a cause of action that arises on the Outer Continental Shelf. In *Rodrigue v. Aetna Casualty and Sur. Co.,* 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969), the Court interpreted the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356, as requiring that "federal law, supplemented by state law of the adjacent State," apply to stationary platforms located on the Outer Continental Shelf. State law will not apply, though, if it contradicts federal law. *Id.* For example, "[w]hen an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls." *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459 (5th Cir.1992). If federal maritime law applies "of its own force," then state law will not apply. *Union Texas Petroleum v. PLT Engineering,* 895 F.2d 1043, 1047 (5th Cir.1990).

■ The Court believes that federal maritime law controls in this case. Plaintiff alleges that a seismic cable struck its platform, leaked oil, and ultimately caused the "shut in" of the platform. The seismic cable trailed from the M/V EDISON CHOUEST at the time of the accident. The facts here are similar to those in *Continental Oil Co. v. London S.S. Owners' Mut. Ins. Ass'n,* 417 F.2d 1030 (5th Cir.1969). In that case, a vessel collided with a drilling and production platform fixed on the Outer Continental Shelf off the coast of Louisiana. The Court held that Louisiana law did not apply because the "collision was a classic maritime case within the validly extended Admiralty jurisdiction ..." *Id.* at 1036. Consequently, this Court finds that Louisiana law does not apply to the instant facts.

### b. *Federal Law*

Plaintiff relies primarily upon two cases to argue that federal common law recognizes the tort of private nuisance in maritime cases. The Court finds that neither case stands for this proposition. First, the court in *Shaughnessy v. PPG Industries, Inc.,* 795 F.Supp. 193 (W.D.La.1992), noted that its decision applied to land-based torts, not maritime claims. Second, rather than applying private nuisance doctrine directly to maritime torts, the court in *S.C. Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160 (5th Cir.1979), merely looked to private nuisance law to decide questions of contributory negligence and damages.

■ The fatal flaw in plaintiff's claim, however, is its failure to carry its burden under Fed.R.Civ.P. 56(e). Assuming that private nuisance applies to maritime suits, a plaintiff would have to establish that a defendant intended to interfere with the use and enjoyment of the maritime interest. *See* W. Page Keeton et al., *Prosser and Keaton on the Law of Torts,* § 87, at 622 (5th ed.1984). As noted above in the intentional tort discussion, plaintiff has not set forth any specific facts showing that an issue exists with regard to defendants' alleged interference.

Consequently, defendants' motion for summary judgment on the issue of private nuisance is **GRANTED,** and plaintiff's cross motion is **DENIED.**

### 2. Public Nuisance

■ Plaintiff has apparently conceded that no cause of action for public nuisance exists in this case. While plaintiff's original complaint seeks damages for public nuisance, its memorandum in opposition to defendants' motion for summary judgment states that

*TESTBANK* "proscribe[s]" such a cause of action (Opposition memorandum, p. 27). Without expressly holding that a party cannot maintain a federal common law cause of action for public nuisance, the *TESTBANK* court noted that the respondent in that case failed to cite any law which recognized such a cause of action. 752 F.2d at 1030 n. 13. This Court likewise has searched in vain for case law which recognizes a federal cause of action for public nuisance. We decline to create such a cause of action, particularly considering that the *TESTBANK* court concluded that the Supreme Court has apparently foreclosed "a federal cause of action for public nuisance caused by the obstruction of navigable waterways." *See id.* (quoting *California v. Sierra Club,* 451 U.S. 287, 296 n. 7, 101 S.Ct. 1775, 1780 n. 7, 68 L.Ed.2d 101 (1981)).

As a matter of law, therefore, plaintiff cannot proceed under a public nuisance theory. Accordingly, defendants' motion for summary judgment on this issue is **GRANTED.** Plaintiff's cross motion did not seek disposition of this issue.

### C. *Federal Water Pollution Control Act*

■ Plaintiff seeks damages pursuant to the Federal Water Pollution Control Act ("FWPCA"), specifically 33 U.S.C. § 1321, for expenses incurred in responding to the Isopar M spill. In order to determine whether plaintiff can maintain this cause of action, the Court examines the statute's language. "[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Section 1321(f) of the FWPCA imposes liability on owners and operators of vessels which discharge oil or other hazardous substances. Subsections (f)(1)–(f)(3) state that owners and operators shall "be liable to the United States Government." Subsection (f)(4) holds owners and operators liable for costs incurred by the "Federal Government or any State government" in restoring natural resources. This language indicates that the FWPCA does not allow private parties to bring suit. In drafting the FWPCA, "Congress intended that private remedies in addition to those expressly provided should not be implied. Where, as here, Congress has made clear that implied private actions are not contemplated, the courts are not authorized to ignore this legislative judgment." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 18, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981). *See generally Complaint of Ballard Shipping Co.,* 772 F.Supp. 721 (D.R.I.1991) (holding that the FWPCA does not give individual states a cause of action).

Plaintiff therefore cannot maintain its FWPCA cause of action. Consequently, defendants' motion for summary judgment on this issue is **GRANTED.** Plaintiff's cross motion did not mention the FWPCA.

### D. *Oil Pollution Act*

■ Plaintiff also seeks damages under the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701–2719, for expenses incurred in responding to the Isopar M spill. Defendants cite *Matter of Cleveland Tankers, Inc.,* 791 F.Supp. 679 (E.D.Mich.1992), for the proposition that plaintiff cannot bring suit under the OPA in order to skirt the *Robins Dry Dock* rule. As noted above, however, the rule does not apply here, and therefore is not fatal to plaintiff's OPA claim.

■ Plaintiff argues that it can recover damages under subsections 2702(b)(2)(B), (C), and (E). These subsections, in conjunction with 2702(a), allow claimants to recover the following damages from parties responsible for the discharge of oil from a vessel:

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

(C) Subsistence use

Damages for loss of subsistence use of natural resources, which shall be recovera-

ble by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

. . . . .

(E) Profits and earning capacity

Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

Considering each subsection in turn, the Court finds as a matter of law that plaintiff cannot recover damages under (B). While plaintiff alleges a loss of personal property, i.e. revenue, plaintiff has not alleged **injury** to personal or real property. The Court reads "injury" to mean physical injury; "injury" does not encompass economic loss because where Congress intended recovery for "loss," it specifically used that word. For example, subsection (B) also allows recovery for "economic losses" resulting from the **destruction** of real or personal property. While plaintiff claims a loss of revenue, that loss did not result from the destruction of any real or personal property. Consequently, subsection (B) provides no relief for plaintiff.

 Subsection (C) provides no ground for damages either. Plaintiff did not make "subsistence use" of natural resources. Such use "relates to use of a natural resource, such as water, to obtain the minimum necessities for life." 791 F.Supp. at 678 (footnote omitted). Rather than using natural resources in this manner, plaintiff had a commercial purpose in drilling for hydrocarbons.

 Finally, the Court notes that plaintiff can maintain a cause of action under subsection (E). Plaintiff alleges that the Isopar M spill caused a loss of future production revenues. Future earnings derived from drilling on the Outer Continental Shelf constitute property, but whether that property be real or personal is irrelevant; in either case, plaintiff can recover for loss of profits. Given the language of subsection (E), the Court cannot say as a matter of law that plaintiff has no cause of action here. Conse-

quently, defendants' motion for summary judgment under the OPA is **DENIED** and plaintiff's cross motion is **GRANTED** insofar as it seeks approval for maintaining a cause of action. The Court, however, certainly cannot make a summary judgment ruling on liability at this point; among other factual issues, the parties obviously dispute the amount of plaintiff's economic loss.

Accordingly,

**IT IS ORDERED** that defendants' motion for summary judgment be and is hereby **GRANTED IN PART** and **DENIED IN PART,** and that plaintiff's cross motion be and is hereby **GRANTED IN PART** and **DENIED IN PART.**